ACCEPTED
14-15-00578-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
7/22/2015 3:39:00 PM
CHRISTOPHER PRINE
CLERK

## NUMBER 14-15-00578-CV

## IN THE COURT OF APPEALS
## FOR THE FOURTEENTH DISTRICT OF TEXAS AT HOUSTON

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
7/22/2015 3:39:00 PM
CHRISTOPHER A. PRINE
Clerk

## In re MICHELIN N. AM., INC., Relator

Original Proceeding from the 152nd Judicial District Court of Harris County, Texas, Honorable Robert Schaffer; Trial Court Cause No. 2014-57952

## RESPONSE TO PETITION FOR WRIT OF MANDAMUS

Tim Riley
State Bar No. 16931300
RILEY LAW FIRM
The Civil Justice Center
112 East 4th Street
Houston, Texas 77007
Telephone: (713) 646-1000
Facsimile: (800) 637-1955
tdr@txtrial.com

Michael Bourland
State Bar No. 24009912
WITT, MCGREGOR & BOURLAND, PLLC
8004 Woodway Drive, Suite 400
Waco, Texas 76712
Telephone: (254) 751-9133
Facsimile: (254) 751-9134
mbourland@wmbwaco.com

John Gsanger
State Bar No. 00786662
Scott Marshall
State Bar No. 24077207
THE EDWARDS LAW FIRM
802 N. Carancahua St., Suite 1400
Corpus Christi, Texas 78401
Telephone: (361) 698-7600
Facsimile: (361) 698-7614
jgsanger@edwardsfirm.com
smarshall@edwardsfirm.com

ORAL ARGUMENT WOULD NOT
LIKELY BENEFIT THE COURT

Attorneys for Robert Coleman, et al.,
Real Parties in Interest

# I. TABLE OF CONTENTS

I.   TABLE OF CONTENTS ......................................................................... ii
II.  INDEX OF AUTHORITIES ................................................................... iv
III. STATEMENT OF THE CASE............................................................viii
IV.  ISSUES PRESENTED ....................................................................... ix

With respect to the two specifically identified tire building machines to…..14
be observed in normal use, did Michelin prove a trade secret despite the fact that (1) the machines were purchased from a third party vendor who also sells such machines to other tires companies besides Michelin, (2) similar machines and tire manufacturing processes have been disclosed on plant tours and on the internet and on both local and national television, and (3) the only evidence purporting to address alleged trade secrets were two conclusory affidavits admittedly based partly on "information made available to" the affiants rather than the affiants' personal knowledge?

With respect to the hour of observation of two tire building machines…..37
in normal use, did the Coleman family demonstrate this discovery was reasonably necessary with (1) the affidavit of a tire expert explaining the observation is "invaluable" "substantive evidence" "critical" to proving causation and safer alternative designs as the "only means of establishing the link between" negligence at the plant and defects in the tire, (2) an affidavit from a second tire expert describing the "importance" and "critical" nature of this observation to prove causation and safer alternative designs, (3) an affidavit from a third expert explaining access to such evidence is "reasonably necessary for them to perform the required failure analyses," and (4) testimony from a fourth expert that  the tire building process is so complicated that describing it is not "anywhere near the amount of helpfulness to the jury as actually showing them the actual manufacturing"?

Did the trial court abuse its discretion when it weighed conflicting.....48
evidence and then ordered a confidential non-destructive observation of tire building machines expressly (1) limited to one hour, (2) limited to observation with no sampling or testing or measurements, (3) limited to just two machines used to build the failed tire at issue, (4) limited to just two stages of the tire-building processes, and (5) limited in who may attend this visual observation?

V.   STATEMENT OF FACTS.................................................................1

   A. The RMS Equipment Co. Machines Used to Build the Failed Tire...1

   B. Disclosure of Michelin's Processes and Problems at the Plant........1

   C. The Defective Michelin Tire Caused a Fatal Crash ..........................4

   D. The Discovery Fight to Observe the Tire Machines for One Hour....5

   E. Objections to Michelin's Statement of Facts and Record .................9

VI.  SUMMARY OF THE ARGUMENT ......................................................11

VII. ARGUMENT.....................................................................................13

   A. The High Standard for Mandamus Review of Discovery Orders....13

   B. Michelin Failed Its Burden to Prove any Basis to Deny Discovery.14

      1. The fatal flaws in Michelin's affidavits.........................................15

         a.  Affidavits cannot be based on information reviewed .............15

         b.  Affidavits cannot be conclusory or lack explanation .............18

         c.  Unanswered questions fatal to Michelin's alleged privilege...28

      2. Michelin misapplies the standard for burdensomeness..............29

         a.  The "creation of evidence" objection was not raised .............31

         b.  Michelin misinterprets *In re Goodyear*...................................34

   C. Coleman Proved the Reasonable Necessity for this Discovery .....37

      1. 1st expert: invaluable causation proof otherwise unavailable .....39

      2. 2nd expert: discovery needed for jury to understand case ..........40

      3. 3rd expert: critical proof of designs to fix manufacturing flaws ....41

      4. 4th expert: discovery reasonably necessary for failure analysis .42

      5. Michelin's objections to the affidavits are unfounded .................43

   D. Conflicting Evidence Provides Discretion for the Narrow Order .....48

VIII. CONCLUSION AND PRAYER ..........................................................53

IX.  CERTIFICATES ...............................................................................54

# II. INDEX OF AUTHORITIES

**Cases**                                                                    **Pages**

*Able Supply Co. v. Moye,*
898 S.W.2d 766 (Tex. 1995)............................................................... 13

*Arlington Mem'l Hosp. Found. v. Barton,*
952 S.W.2d 927 (Tex. App.-Fort Worth 1997, orig. proceeding) ........................ 18

*Arkoma Basin Exploration Co. v. FMF Assocs. 1990–A, Ltd.,*
249 S.W.3d 380 (Tex. 2008)............................................................... 18

*Atlas Bradford Co. v. Tuboscope Co.,*
378 S.W.2d 147 (Tex. Civ. App.-Waco 1964, no writ) ................................ 17, 23

*Blundon v. Goodyear Dunlop Tires N. Am. Ltd.,*
11CV990S, 2012 WL 5473069 (W.D.N.Y. Nov. 9, 2012) ................................. 50

*Cameron County v. Hinojosa,*
760 S.W.2d 742 (Tex. App.—Corpus Christi 1988, orig. proceeding) ................ 15

*Computer Assoc. Int'l, Inc. v. Altai, Inc.,*
918 S.W.2d 453 (Tex. 1996)............................................................... 19

*Cooper Tire & Rubber Co. v. Lahey,*
No. 13-09979-S (Kan. Dec. 23, 2013) .............................................. 50

*Ex parte Continental Tire the Americas, LLC,*
No. 1130556 (Ala. Apr. 9, 2014) .................................................. 50

*Garcia v. Peeples,*
734 S.W.2d 343 (Tex.1987)............................................................... 13

*Griffith v. Goodyear Dunlop Tires N. Am. Ltd.,*
11CV761S, 2012 WL 5473494 (W.D.N.Y. Nov. 9, 2012) ................................. 50

*Independent Insulating Glass/Southwest, Inc. v. Street,*
722 S.W.2d 798 (Tex. App.—Ft. Worth 1987, writ dism'd w.o.j.)....................... 32

*In re Angelini,*
186 S.W.3d 558 (Tex. 2006) (orig. proceeding)................................... 49

*In re Bass,*
113 S.W.3d 735 (Tex. 2003) (orig. proceeding)................................... 37

*In Re Bridgestone/Firestone,*
 No. 01-01-410 (Tex. Coordinated Litigation, Sep. 20, 2001) ............................. 50

*In re Bridgestone/Firestone, Inc.,*
 106 S.W.3d 730 (Tex.2003) (orig. proceeding)................................. 15, 18, 38, 46

*In re Cercone,*
 323 S.W.3d 293 (Tex. App.—Dallas 2010, orig. proceeding) ............................ 14

*In re CI Host, Inc.,*
 92 S.W.3d 514 (Tex. 2002) (orig. proceeding).................................................... 14

*In re Colonial Pipeline Co.,*
 968 S.W.2d 938 (Tex.1998) (orig. proceeding).................................................... 13

*In re CSX Corp.,*
 124 S.W.3d 149 (Tex. 2003) (orig. proceeding)................................................... 13

*In re E.I. DuPont de Nemours & Co.,*
 136 S.W.3d 218 (Tex. 2004) (orig. proceeding).................................................. 18

*In re Goodyear Tire & Rubber Co.,*
 437 S.W.3d 923 (Tex. App.—Dallas 2014, orig. proceeding) ........................34-36

*In re Guidry,*
 316 S.W.3d 729 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding)........ 48

*In re HEB Grocery Co., L.P.,*
 375 S.W.3d 497 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding)........ 31

*In re Kimberly-Clark Corp.,*
 228 S.W.3d 480 (Tex. App.—Dallas 2007, orig. proceeding) ............................ 29

*In re Kuntz,*
 124 S.W.3d 179 (Tex.2003) (orig. proceeding)........................................... 14, 49

*In re Le,*
 335 S.W.3d 808 (Tex. App.—Houston [14th Dist.] 2011, orig. proceeding)........ 48

*In re Pirelli Tire, L.L.C.,*
 247 S.W.3d 670 (Tex. 2007) (orig. proceeding).................................................. 49

*In re Sanders,*
 153 S.W.3d 54 (Tex.2004) (orig. proceeding)............................................. 14, 48

*In re Union Carbide Corp.,*
 145 S.W.3d 805 (Tex. App.—Houston [14th Dist.] 2004, orig. proceeding)........ 49

*In re Union Pac. R.R. Co.,*
294 S.W.3d 589 (Tex. 2009) (orig. proceeding)............................................. 37-38

*In re Whiteley,*
79 S.W.3d 729 (Tex. App.-Corpus Christi 2002, orig. proceeding)............... 30-31

*In re Wyatt Field Serv. Co.,*
454 S.W.3d 145 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding).. 14, 48

*ISK Biotech Corp. v. Lindsay,*
933 S.W.2d 565 (Tex. App.-Houston [1st Dist.] 1996, no pet.).......................... 30

*John Paul Mitchell Sys. v. Randalls Food Markets, Inc.,*
17 S.W.3d 721 (Tex. App.-Austin 2000, pet. denied) ....................................... 38

*Jordan v. Court of Appeals for the Fourth Supreme Judicial District,*
701 S.W.2d 644 (Tex. 1985).............................................................................. 15

*Kerlin v. Arias,*
274 S.W.3d 666 (Tex. 2008)................................................................ 16, 21, 26

*Lamont v. Vaquillas Energy Lopeno Ltd., LLP,*
421 S.W.3d 198 (Tex. App.—San Antonio 2013, review denied) ....................... 20

*Luccous v. J.C. Kinley Co.,*
376 S.W.2d 336 (Tex. 1964)............................................................................. 20

*Mansions in the Forest, L.P. v. Montgomery County.,*
365 S.W.3d 314 (Tex. 2012)............................................................................. 45

*Marks v. St. Luke's Episcopal Hosp.,*
319 S.W.3d 658 (Tex. 2010)....................................................................... 12, 16

*Overstreet v. Home Indem. Co.,*
747 S.W.2d 822 (Tex. App.—Dallas 1987, writ denied) .................................... 32

*Peeples v. Honorable Fourth Supreme Judicial District,*
701 S.W.2d 635 (Tex.1985).............................................................................. 32

*Phillips v. Frey,*
20 F.3d 623 (5th Cir. 1994) ............................................................................. 23

*Pink v. Goodyear Tire & Rubber Co.,*
324 S.W.3d 290 (Tex. App.—Beaumont 2010, pet. dism'd) .............................. 18

*Rivera v. Yokohama Tire Corp.,*
No. C-1745-00-B (93rd Dist. Ct. Hidalgo County, Tex., Mar. 19, 2002).............. 50

*Rodriguez v. Naylor Indus., Inc.,*
763 S.W.2d 411 (Tex. 1989)................................................................. 17, 24

*Shakur v. Bridgestone/Firestone, Inc.,*
CIV-05-983-C, 2006 WL 1451490 (W.D. Okla. May 24, 2006) .......................... 51

*Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc.,*
879 S.W.2d 89 (Tex. App.—Houston [14th Dist.] 1994, writ denied) ................. 11

*Southtex 66 Pipeline Co. v. Spoor,*
238 S.W.3d 538 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)............... 18

*Unifund CCR Partners v. Villa,*
299 S.W.3d 92 (Tex. 2009) (orig. proceeding)................................................... 48

*Valenzuela v. State & County Mut. Fire Ins. Co.,*
317 S.W.3d 550 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ................ 15, 16

*Walker v. Packer,*
827 S.W.2d 833 (Tex.1992) (orig. proceeding)................................................... 14

*Walter v. Marathon Oil Corp.,*
422 S.W.3d 848 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ..................... 48

*Washington DC Party Shuttle, LLC v. IGuide Tours,*
406 S.W.3d 723 (Tex. App.—Houston [14th Dist.] 2013, pet denied)........... 12, 16

## Rules and Other Authorities                                     **Pages**

Tex. R. App. 52.3(g) ............................................................................................. 10

Tex. R. App. 52.3(h) ............................................................................................. 33

Tex. R. App. 52.7(a)(1) ......................................................................................... 10

Tex. R. App. 52.11(c) ............................................................................................ 10

Tex. R. App. 52.11(d) ...................................................................................... 10, 34

Tex. R. Civ. P. 193.2(e) ......................................................................................... 32

Tex. R. Civ. P. 193.4(a) ................................................................................... 14, 44

Tex. R. Civ. P. 196.2(a) ................................................................ 32

Tex. R. Evid. 801(d) .................................................................... 44

Tex. R. Evid. 802 ........................................................................ 44

Tex. Gov't Code Ann. § 312.011(1) ............................................. 45

## III.  STATEMENT OF THE CASE

Nature of Case:  This is a wrongful death and personal injury case about how the grossly negligent tire building practices at Michelin's Fort Wayne tire plant resulted in a defective tire.

Rulings at Issue:  After a hearing, extensive briefing by both sides, and copious conflicting evidence, the trial court allowed a confidential observation of the two tire building machines used to build the failed tire with no sampling or testing or measurement of those machines, limited to one hour, limited to just two stages of the tire-building processes, and limited in who may attend this visual observation.

Respondent:  Hon. Robert Schaffer, Judge presiding over the 152nd Judicial District Court, Harris County Civil Courthouse, 201 Caroline, 11th Floor, Houston, Texas 77002.

Relief Sought:  Michelin would have this Court reverse the trial court's extremely narrow one-hour visual observation of two tire building machines despite the fact that the order is based on conflicting evidence, including evidence from four tire experts explaining the reasonable necessity of the observation to link the misconduct at the plant to the defects in the tire.

## IV. ISSUES PRESENTED

With respect to the two specifically identified tire building machines to be observed in normal use, did Michelin prove a trade secret despite the fact that (1) the machines were purchased from a third party vendor who also sells such machines to other tires companies besides Michelin, (2) similar machines and tire manufacturing processes have been disclosed on plant tours and on the internet and on both local and national television, and (3) the only evidence purporting to address alleged trade secrets were two conclusory affidavits admittedly based partly on "information made available to" the affiants rather than the affiants' personal knowledge?

With respect to the one hour of observation of two building machines in normal use, did the Coleman family demonstrate this discovery was reasonably necessary with (1) the affidavit of a tire expert explaining the observation is "invaluable" "substantive evidence" "critical" to proving causation and safer alternative designs as the "only means of establishing the link between" negligence at the plant and defects in the tire, (2) an affidavit from a second tire expert describing the "importance" and "critical" nature of this observation to prove causation and safer alternative designs, (3) an affidavit from a third expert explaining access to such evidence is "reasonably necessary for them to perform the required failure analyses," and (4) testimony from a fourth expert that the tire building process is so complicated that describing it is not "anywhere near the amount of helpfulness to the jury as actually showing them the actual manufacturing"?

Did the trial court abuse its discretion when it weighed conflicting evidence and then ordered a confidential non-destructive observation of tire building machines expressly (1) limited to one hour, (2) limited to observation with no sampling or testing or measurements, (3) limited to just two machines used to build the failed tire at issue, (4) limited to just two stages of the tire-building processes, and (5) limited in who may attend this visual observation?

## V. STATEMENT OF FACTS

A. *The RMS Equipment Co. Machines Used to Build the Failed Tire*

In August of 2003, RMS Equipment Co. manufactured the RMS 2000 first stage tire building machine, which Michelin purchased and eventually used to put the innerliner and carcass plies into the failed tire at issue. *MR 702.* Later that year, in October, RMS Equipment Co. manufactured the RMS 3500 second stage tire building machine, which Michelin also purchased and used to put the steel belts and nylon plies into the failed tire. *MR 702-03.* These are the only two tire building machines the Coleman family has requested to observe. *MR 57-66.*

In February of 2011 – eight years after Michelin purchased the two tire building machines from RMS Equipment Co. – Michelin used those two machines to build the defective tire which gave rise to this case. *MR 117, 421, 702-03.* That tire was an LT265/75R16 size BF Goodrich Rugged Terrain T/A tire, and it was assembled at Michelin's tire plant in Fort Wayne, Indiana. *MR 117, 421, 702-03.*

B. *Disclosure of Michelin's Processes and Problems at the Plant*

In March of 2011, just a month after the failed tire was manufactured at Michelin's Fort Wayne plant, local television stations broadcast video of the tire manufacturing process filmed from inside the plant on the evening news:

1







*MR 155-56, 372-74.* Later that year, the National Geographic television program *Mega-factories: Michelin* was broadcast nationwide, and it showed Michelin tire building machines and processes at another Michelin tire plant:







*MR 155-56, 375-77.*

During the four-year period beginning in 2011 when the failed tire was made at the Fort Wayne plant, Michelin gave tours of the plant, including the tire building room, to government officials, to family members of plant workers, to tire dealers, and – most importantly – to customers. *MR 490, 696-700, 723.*

In September of 2012, Robert Coleman became a Michelin customer when he purchased the BF Goodrich Rugged Terrain T/A tire and had it mounted on his pickup.

In September of 2013, Tracey Crocker, Milo Felger, Mary Wheeler, and other workers from the Fort Wayne tire plant testified (in another case) about grossly negligent tire building practices and falsified quality control processes at the plant. *MR 652-53, 657-661, 676-77, 680-92, 722.*

In March of 2014, Michelin's employees at the Fort Wayne tire plant were discussing plant operations freely on the internet (describing the work as "crappy" and "FILTHY") and posting photographs to show what Michelin's tire building machines look like:

3



Yeah, that's all down in mixing which is it's own far end separate section of the plant. Crappy job, you get FILTHY, but pays about $22/hr and is easy to move into if you want the quick move up for the money.

This is a tire building machine:

You manually put the beads on to each end, then the machine closes, and the trays up above feed the ply material to it which the machine automates rolling around for an even roll every time. Depending on the tire there could be 1 ply, there could be 3 or more plies. Some you manually cut the plies, some the machine does it. THen the machine rolls the material around the bead, sidewall material is added, and it's off to another machine to form the tire and add tread.

*MR 154-55, 362-65.*

### C. *The Defective Michelin Tire Caused a Fatal Crash*

In August of 2014, less than two years after Robert Coleman bought the BF Goodrich Rugged Terrain T/A tire, the tread peeled off of the tire on the Coleman family's pickup, resulting in a fatal crash with Beverly Kilpatrick, and the official Crash Report identified the defective tire as causing the crash:



4

*SuppR 5-6, 22-27.*[1]

D. *The Discovery Fight to Observe the Tire Machines for One Hour*

In October of 2014, the surviving family members of Beverly Kilpatrick sued Michelin as well as Robert Coleman. *MR 1-8.*

In December of 2014, the Coleman family conferred with Michelin about a protocol to observe the two "tire building machines which were used to assemble the innerliner and the steel belts with their nylon reinforcement." *MR 45.* After Michelin declined to offer a protocol, the Coleman family intervened in the case and requested a one-hour observation for the two identified machines pursuant to a detailed protocol. *MR 9-28, MR 57-66.* The Coleman family's intervention is based on Michelin's gross negligence at the Fort Wayne tire plant in the tire building and quality control process as the cause of the defects in the failed tire. *MR 17-21, 25-26.* Accordingly, the Coleman family asked Michelin to preserve the two tire machines at issue and provided Michelin with information to help Michelin identify the two specific machines used to make the failed tire. *SuppR 36-39, 44-45.*[2]

In January of 2015, at the first discovery hearing in this case, the

_____

[1] Michelin's mandamus record includes the Coleman family's petition in intervention, but omits the exhibits filed as attachments to the petition. These omitted exhibits include the official Texas Peace Officer's Crash Report, which was incorporated in the petition in intervention, and is included in the supplemental record.

[2] Michelin's mandamus record generally omits the documents concerning Michelin's unwillingness to preserve the tire building machines at issue. *SuppR 36-181.*

Coleman family raised concerns about Michelin's unwillingness to preserve the tire building machines which are the subject of the challenged order. *SuppR 127.* Later that month, on the eve of Michelin's deadline to respond to the discovery request to observe the tire machines, Michelin objected and asserted a trade secret privilege. *SuppR 237-38.*[3] In response, the Coleman family moved for "one hour of limited access to [two] particular tire building machines" with no "sampling or destructive testing and … nothing more than a visual observation." *MR 29-37.* The Coleman family's motion to compel included the affidavit of Dennis Carlson, a former Michelin tire engineer who explained why access to the tire building machines was necessary discovery:

> When simultaneously addressing claims involving both negligent practices at the tire plant as well as manufacturing and design defects, such observations of the tire machines while in use – even one hour of observation limited to cause no interruption to the manufacturing process as set forth in the attached order – is invaluable to documenting how the criticized manufacturing processes contributed to (or failed to contribute to) the manufacturing anomalies identified in the tire. This substantive evidence was critical to establishing (1) the causal link between the criticized practices at the plant and the flaws in the tire, (2) the relative simplicity of incorporating safer tire designs calculated to increase the tire's robustness so that it would have been less susceptible to premature failure as a result of manufacturing defects, (3) better practices to more carefully build and inspect tires so that fewer tires with anomalies reach the consuming public, etc. This type of evidence is especially critical [because]

---

[3] Michelin's mandamus record includes the first 48 pages of its discovery responses, *MR 414-61*, but excludes those pages which show its objections and assertions of privileges to the request to observe the tire building machines. *SuppR 237-38.*

… obtaining discovery from the tire companies is commonly the only means of establishing the link between a criticized practice at the tire plant and the safety concerns which subsequently manifest in a tire tread separation failure that kills or injures a claimant.

*MR 104-05.* This motion also included the testimony of a second tire engineer (Joe Grant, a witness who often works on behalf of Michelin in litigation), and he also explained the importance of this evidence:

Oh, most jurors, I'm sure, have no idea how tires are actually manufactured, or the complex nature of the various components, and the steps that have to go through – that have to be gone through in order to manufacture a tire. So I think [videotape of the tire building process at the plant] would be very beneficial from that standpoint, from a juror's perspective…. [I]t's a pretty complex process that, telling it I don't think does anywhere near the amount of – of helpfulness to the jury as actually showing them the actual manufacturing. I think they'd find it actually very interesting.

*MR 112.* When Michelin asked for additional time to respond to the motion to compel, the Coleman family offered to postpone the hearing provided that Michelin would agree at least to preserve the two tire building machines, but Michelin refused. *SuppR 177-78.*

In February, Michelin moved to strike the affidavit of Dennis Carlson but not the testimony of Joe Grant. *MR 104-110, 111-12, 118-41.*

In March, The Coleman family filed a response explaining how Michelin's motion to strike was mistaken, *MR 145-48,* and offered affidavits from two more tire engineers (including another former Michelin engineer)

who further documented why access to the machines was necessary discovery:

> I recently observed the assembly and building of tires at a manufacturing plant …. The importance of evidence derived from such an inspection is to establish its link to the observed defects or inadequacies of the failed subject tire and to identify capabilities of the manufacturer to produce a more robustly designed tire. These observations of the tire building machines in operation building a tire as near as practical to the tire at issue as contrasted to building a tire with known safer tire designs provides critical evidence to prove how careless conditions at the plant can result in manufacturing defects and to prove the ease with which the tire company can implement more robust tire designs to overcome shortcomings resulting from those tire building processes.

*MR 312.*

> [T]he most widely known recent failure analysis is probably the one performed on the Firestone Radial ATX and Wilderness AT tires that were the subject of a massive recall in 2000. … Firestone retained the services of an outside consultant, Dr. Sanjay Govindjee, of the University of California at Berkeley, to attempt to provide an understanding about the failure mode seen in the subject tires. As part of his work, Dr. Govindjee's report indicated that he had access to … the Decatur, Illinois, tire plant as part of his analysis. NHTSA also retained the service of an outside consultant, Dr. William J. Van Ooij, of the University of Cincinnati, to assist in their failure analysis. Dr. Van Ooij's report indicated that his analysis was based on, among other things, … a tour of the Decatur, Illinois plant, tours of three other non-Firestone tire manufacturing facilities ... The depth and breadth of the information provided to these outside consultants in this matter was consistent with that reasonably necessary for them to perform the required failure analyses with scientific integrity.

*MR 314, 319-20* (Michelin did not seek to strike this affidavit from the second

Michelin tire engineer). The Coleman family also objected to the only evidence that Michelin offered to oppose the discovery because both affidavits were conclusory and based on information made available to the affiants rather than based solely on personal knowledge:



*MR 606-17; see also MR 485, 584.*

On March 16th, the trial court heard the discovery dispute, including the Coleman family's objections to Michelin's evidence and Michelin's objections to the Coleman family's evidence. *MR 738-71.* At the hearing, the Coleman family served a bench brief addressing the burdens of proof, *MR 759, SuppR 182-85,* and – after the hearing – another brief clarifying Michelin's statements at the hearing. *MR 644-726.*

In April, the trial court denied Michelin's motion to strike the affidavit of one of the four tire engineers whose testimony the Coleman family offered and granted one hour's observation of the tire machines. *MR 732-35.*

*E. Objections to Michelin's Statement of Facts and Mandamus Record*

Rule 52 expressly requires a mandamus petition to include "the facts pertinent to the issues or points presented" in the statement of facts and expressly forbids "omitting an obviously important and material fact." Tex. R. App. 52.3(g), 52.11(c). Likewise, with respect to the record, "Relator must file … a certified or sworn copy of every document that is material to the relator's claim for relief and that was filed in any underlying proceeding." *Id.* 52.7(a)(1), 52.11(d). Michelin failed to meet these standards.

Michelin's record and petition omit the following documents and facts:

- The exhibits attached to and filed with Original Petition in Intervention of Robert Coleman and Kimberly Coleman for Blayne Cook and Cameron Cook; *SuppR 1-35 (SuppR 21-35 was omitted from the record)*;

- Intervenors' Response to Michelin's Motion to Inspect the Failed Tire by Unknown Persons According to an Undisclosed Protocol and Request that Michelin Preserve and Document Evidence; *SuppR 36-126*;

- Intervenors' Opposition to Defendant Michelin's Motion for Continuance of Hearing on Motion to Preserve Evidence; *SuppR 127-81*;

- Bench Brief on Burden Shifting to Party Seeking Discovery if Resisting Party Proves Trade Secrecy (The Burden Never Shifted But Was Nevertheless Met); *SuppR 182-85*;

- The pages within Michelin North America, Inc.'s Responses and Objections to Intervening Coleman's First Requests for Admission, Interrogatory, and Requests for Production to Defendant, Michelin North America, Inc., where Michelin responded to the discovery request at issue; *SuppR 186-242 (SuppR 234-42 was omitted from the record)*;

10

- Michelin's statement of facts raises the objection that the order requires the "creation of evidence," but Michelin fails to note that its objections in response to the discovery request to observe the tire machines do not assert such an objection; *compare Pet. Mand. p. 9 with SuppR 237-38;*

- Michelin's statement of facts says the failed tire shows pre-existing damage, *Pet Mand. p. 1*, but this is disputed and was not an issue before the trial court (which is why Michelin offers no record citation);

- Michelin's statement of facts says the Coleman family offered no competent evidence of the necessity of the discovery, but then Michelin mentions neither Joe Grant's deposition testimony nor John Daws' affidavit; *compare Pet. Mand. p. 2 with SuppR 314-23;* and

- Michelin's statement of fact argues that no discovery is necessary because the substance of the experts' opinions have been disclosed prior to the observation of the tire machines, but this was neither before the trial court nor relevant to the discovery dispute. *See Pet. Mand. p. 7.*

## VI.  SUMMARY OF THE ARGUMENT

The issue before this Court is a narrow discovery dispute.  The trial court had conflicting evidence, including proof that Michelin had previously publicly disclosed similar information and proof that observation of the tire building machines is necessary for a fair trial.  Based on this evidence, the trial court granted the narrowest possible confidential access to the two specific machines.  Specifically, the time and place of the visual observation of the machines are limited, the attendees are limited, the conduct of the attendees is limited, and measurements and sampling and testing and public disclosure are all forbidden.

11

Michelin failed to prove the requested information is a trade secret because the law requires that the "subject matter of a trade secret must be secret." *Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 95 (Tex. App.—Houston [14th Dist.] 1994, writ denied). The trial court had ample basis to conclude that Michelin's tire building operations had been previously disclosed more broadly than the one-hour observation at issue would entail. Moreover, Michelin's only evidence was two conclusory affidavits where both affiants admittedly based statements within their affidavits on information made available to them. The Coleman family specifically objected to these fatal flaws in the affidavits, citing governing authorities from this Court and the Texas Supreme Court. *See, e.g., Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 666 (Tex. 2010); *Washington DC Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 731-32 (Tex. App.—Houston [14th Dist.] 2013, pet denied).

Notwithstanding the fact that Michelin did not meet its burden of proof, the Coleman family nevertheless proved this discovery is necessary for a fair trial. Specifically, the Coleman family offered evidence from four tire engineers to explain why access to the tire building machines is critical where there are claims of negligence at the plant leading to defects in a tire made at the plant

12

Even if this Court were to leave aside the fatal weaknesses in Michelin's affidavits and the strength of the Coleman family's proof, the trial court's order was based on conflicting evidence, and mandamus review is inappropriate for reweighing conflicting evidence.

## VII. ARGUMENT

### A. *The High Standard for Mandamus Review of Discovery Orders*

Because the "scope of discovery is largely within the trial court's discretion," mandamus will issue only "to correct a discovery order if the order constitutes a clear abuse of discretion." *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 941 (Tex.1998) (orig. proceeding). Discovery rulings must reflect that "the ultimate purpose of discovery is to seek the truth, so that disputes may be decided by what the facts reveal, not by what facts are concealed," and all parties "are entitled to full, fair discovery within a reasonable period of time." *Id.* (quoting and citing *Able Supply Co. v. Moye*, 898 S.W.2d 766, 773 (Tex.1995); *Garcia v. Peeples*, 734 S.W.2d 343, 347 (Tex.1987)). In this context, a trial court abuses its discretion only when its discovery ruling is "unreasonable or arbitrary" because the trial court made its decision "without reference to guiding rules and principles." *Id.* Because Michelin, as the relator, must show that the challenged ruling was "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law," the burden

13

"on the party resisting discovery … is a heavy one."  *In re CSX Corp.*, 124 S.W.3d 149, 151 (Tex. 2003) (orig. proceeding).

"In determining whether the trial court abused its discretion with respect to resolution of factual matters, we may not substitute our judgment for that of the trial court and may not disturb the trial court's decision unless it is shown to be arbitrary and unreasonable." *In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 149 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding) (quoting *In re Sanders,* 153 S.W.3d 54, 56 (Tex.2004) (orig. proceeding)); *see also Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding) ("With respect to resolution of factual issues or matters committed to the trial court's discretion, for example, the reviewing court may not substitute its judgment for that of the trial court.").  The Court of Appeals "may not resolve disputed fact issues in an original proceeding."  *In re Cercone*, 323 S.W.3d 293, 295 (Tex. App.—Dallas 2010, orig. proceeding).

The Texas Supreme Court has clearly established that the trial court's factual determinations are not to be second guessed on mandamus:

> A trial court's determination of a factual issue is entitled to deference in a mandamus proceeding and should not be set aside unless it is clear from the record that only one decision could have been reached.

*In re Kuntz*, 124 S.W.3d 179, 180 (Tex.2003) (orig. proceeding).

B.  *Michelin Failed Its Burden to Prove any Basis to Deny Discovery*

"The party making the objection or asserting the privilege must present any evidence necessary to support the objection or privilege." Tex. R. Civ. P. 193.4(a); *In re CI Host, Inc.*, 92 S.W.3d 514, 516 (Tex. 2002).  Because the party asserting the privilege bears the burden of proof, if there is a fact issue about disclosure of the privileged information to third parties, then the burden to prove the privilege also requires proof that no waiver occurred:

> The burden of proof to establish the existence of a privilege rests on the one asserting it.  If the matter for which a privilege is sought has been disclosed to a third party, thus raising the question of waiver of the privilege, the party asserting the privilege has the burden of proving that no waiver has occurred.

*Jordan v. Court of Appeals for the Fourth Supreme Judicial District*, 701 S.W.2d 644, 648-48 (Tex. 1985) (citations omitted); *see also Cameron County v. Hinojosa*, 760 S.W.2d 742, 745-46 (Tex. App.—Corpus Christi 1988, orig. proceeding).  A "party who claims the trade secret privilege cannot do so generally but must provide detailed information in support of the claim."  *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732 (Tex.2003) (orig. proceeding).

### 1.  The fatal flaws in Michelin's affidavits

### a.  Affidavits cannot be based on information the affiant reviewed

In both of Michelin's affidavits, the witness purports to base his affidavit,

15

in part, on "information available to me." *MR 485, 584.* This fatal flaw eviscerates both affidavits.

Contrary to Michelin's affidavits, "to have probative value, the affiant must swear the facts in the affidavit reflect his personal knowledge." *Valenzuela v. State & County Mut. Fire Ins. Co.*, 317 S.W.3d 550, 552-53 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (quoting *Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008) (per curiam)). Furthermore, an "affidavit must explain how the affiant has personal knowledge," *id.*, and Michelin's affidavits not only fail to explain how the affiants have personal knowledge of all the facts asserted, the affidavits affirmatively state they are based in part on "information available" to the affiants.

An affiant's claim that the affidavit is "true and correct to the best of my personal knowledge and belief" based on a review of testimony, documents, and accounts is insufficient to create any probative value. *Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008); *see also Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 666 (Tex. 2010) (op. on reh'g) (a lack of personal knowledge renders an affidavit legally insufficient); *Washington DC Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 731-32 (Tex. App.—Houston [14th Dist.] 2013, pet denied) (same).

Michelin's affidavits are even weaker than the affidavit this Court

16

rejected in the *Valenzuela* case where the affiant claimed personal knowledge and identified her job title as the basis for that knowledge but did not explain "how her job duties… afforded her the knowledge … or how she was familiar with this particular" issues in dispute. *Valenzuela*, 317 S.W.3d at 554.

Slagh does not work at Michelin's Fort Wayne tire plant nor does his affidavit profess that he has ever even visited the plant. *MR 584-87*. The in-plant information that Slagh provides is something he claims to have "confirmed" rather than anything he personally knew, *MR 585,* presumably based on information Michelin made "available to" him for the creation of his affidavit, *MR 584*, rather than personal knowledge.

Peirano admits that some of Michelin's technology is disclosed through its patents, *MR 489*, but he never says what machines and processes are disclosed and which are not disclosed, and he never states how he would have personal knowledge to address this critical issue. *See Atlas Bradford Co. v. Tuboscope Co.*, 378 S.W.2d 147, 148 (Tex. Civ. App.-Waco 1964, no writ) (a potential "'trade secret' is no longer a 'secret after the issuance of the patent, and is no longer entitled to the protection of the law of trade secrets'"). Peirano admits that some tire dealers, employees' family members, and Michelin customers are given tours of the Fort Wayne plant, *MR 489-90*, and he admits that school children have also been given plant tours but he is "not

17

aware" of any recent plant tours for school children. *MR 490. See Rodriguez v. Naylor Indus., Inc.*, 763 S.W.2d 411, 413 (Tex. 1989) ("an employee's lack of awareness is not conclusive on the issue"). Most significantly, Peirano does not state that he has participated in any of these plant tours or what has been disclosed on such tours or how he would have personal knowledge of that key fact. *MR 489-90; cf. MR 723-24.* Similarly, Peirano states that the various unidentified persons who have been permitted to tour the Fort Wayne plant "would not recognize or appreciate the specific confidential plant processes," *MR 490*, but Peirano offers no explanation of how he would have personal knowledge of this.

### b. Affidavits cannot be conclusory or lack explanation

If the party resisting discovery attempts to prove a privilege by affidavit, it "must necessarily be descriptive enough to be persuasive." *Arlington Mem'l Hosp. Found. v. Barton*, 952 S.W.2d 927, 929 (Tex. App.-Fort Worth 1997, orig. proceeding). Accordingly, "an affidavit is of no probative value if it merely presents global allegations" asserting that the discovery requested is privileged. *In re E.I. DuPont de Nemours & Co.,* 136 S.W.3d 218, 224 (Tex. 2004); *see also Pink v. Goodyear Tire & Rubber Co.*, 324 S.W.3d 290, 296–97 (Tex. App.—Beaumont 2010, pet. dism'd) (an affidavit is "is considered conclusory if it is essentially a 'conclusion without any explanation,'" quoting

18

*Arkoma Basin Exploration Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 389 & n. 32 (Tex. 2008)); *Southtex 66 Pipeline Co. v. Spoor*, 238 S.W.3d 538, 542 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (affidavits must contain specific factual bases that would be admissible in evidence and which the conclusions are based upon); *see also In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732 (Tex.2003) (orig. proceeding) ("a party who claims the trade secret privilege cannot do so generally but must provide detailed information in support of the claim.").

Michelin failed to meet this burden.

For example, Peirano's affidavit states that the first stage tire building machine used to assemble the failed tire has been modified to change its "tray movements, bead sets, sidewall cutters, plumbing and programming, finish strip application, timers, and bar coding." *MR 487.* Yet the Coleman family has made no complaint about the failed tire's tray movements, bead sets, sidewall cutters, plumbing and programming, finish strip application, timers, or bar coding. *See MR 9-28.* Peirano makes no effort to explain why such unrelated changes would have bearing on the request for a mere 15 minutes of access to this first stage tire building machine. Most importantly, since the first stage tire building machine was purchased from RMS Equipment Co., and Michelin's own evidence mentions only a few modifications, the overwhelming

19

preponderance of the machine remains as originally designed and built by RMS Equipment Co. To the extent that this machine is known to third parties (such as RMS Equipment Co. and its customers in the tire industry), this machine cannot possibly qualify as Michelin's trade secret. *See Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 457 (Tex. 1996) ("once a trade secret is made public all ownership is lost."); *Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336, 338 (Tex. 1964) ("It is self-evident that the subject matter of a trade secret must be kept secret."); *Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, 421 S.W.3d 198, 210 (Tex. App.—San Antonio 2013, review denied) ("Secrecy is a key part in the definition of a trade secret."). Peirano makes no effort to explain how tray movements, bead sets, sidewall cutters, plumbing and programming, finish strip application, timers, and bar coding would be disclosed in the 15 minute observation or how those details give Michelin an advantage over competitors. When Peirano discusses Michelin's putative trade secrets, *MR 488-92*, he discusses machines and processes scattered throughout the plant rather than discussing the specific request to observe RMS Equipment Co.'s first stage tire building machine for 15 minutes.

Likewise, Peirano's affidavit states that the second stage tire building machine used to assemble the failed tire has been modified to change its "tread stitcher, unloader movement, servo controls, fault detection, turret logic

and cycles times." *MR 487.* Again, the Coleman family's extremely detailed petition has made no mention of these aspects of the failed tire's assembly. *See MR 9-28.* Moreover, Peirano neglects to explain why such changes would have bearing on the request for limited access to this second stage tire building machine. Significantly, the Coleman family's request for 45 minutes of access to the second stage tire building processes focuses primarily on "alternative" tire processes and so changes from the 2011 process have little relationship to the discovery request. Because Michelin lists "tread stitcher, unloader movement, servo controls, fault detection, turret logic and cycles times" as the few modifications to the machine as designed and sold by RMS Equipment Co., the overwhelming majority of the machine is not secret from RMS Equipment Co. and its customers. The record contains no proof to explain how tread stitcher, unloader movement, servo controls, fault detection, turret logic and cycles times would be disclosed in the observation or how those details give Michelin any advantage over competitors. Again, Peirano's discussion of Michelin's trade secrecy allegations focuses on machines and processes scattered throughout the plant and does not focus on the request to observe RMS Equipment Co.'s second stage tire machine for 45 minutes.

Pierano's affidavit next states that "MNA does not **believe** that any other tire manufacturer uses tire building machines configured similarly to these

21

machines." *MR 487-88* (emphasis added). Such information based on a mere belief has no probative value. *Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008). He further states "***Many*** of the production machines used at the Woodburn, Indiana, plant are designed, built, and/or modified and installed by MNA itself," but conspicuously omits stating that the two machines the Coleman family asked to view were designed or built by Michelin. *MR 490* (emphasis added). This evasiveness appears to be intentional because, contrary to the impression implied in Peirano's affidavit, Michelin's other discovery responses confirm that the two tire building machines which the Coleman family has asked to review were purchased from a third-party vendor. *MR 702-03.* The machines Michelin is seeking to hide from the discovery process were not even designed or manufactured by Michelin.

Next, Peirano claims that a tire "cannot be 'reversed-engineered' to reveal the specific manufacturing processes, techniques, and equipment used to construct them." *MR 488.* Yet Peirano's qualifying language is carefully crafted so that it does not dispute that tires are reverse engineered to reveal their raw materials and tire construction, which is routinely performed in the tire industry, *MR 318-19*; *see also:*

22



*MR 621-38.* Peirano's conclusory and evasive statements about reverse engineering are fatal to Michelin's trade secrecy arguments because "reverse engineering applied to the finished product" is an exception to trade secrecy because "trade secret law does not offer protection against discovery by fair and honest means such as ... 'reverse engineering.'" *Phillips v. Frey*, 20 F.3d 623, 628 (5th Cir. 1994) (applying Texas law).

Peirano claims that "***Most*** of MNA's processes and machinery are not patented for fear of losing their secrecy." *MR 489* (emphasis added). This statement that ***most*** of Michelin's processes and machinery are not patented fails to address whether or not some or all of the processes and machinery requested to be observed are patented. Again, Peirano's conclusory and evasive statements are fatal to Michelin's trade secrecy arguments because a "'trade secret' is no longer a 'secret after the issuance of the patent, and is no

23

longer entitled to the protection of the law of trade secrets.'" *Atlas Bradford Co. v. Tuboscope Co.*, 378 S.W.2d 147, 148 (Tex. Civ. App.-Waco 1964, no writ). There is no evidence, for example, that the first stage machine's tray movements, bead sets, sidewall cutters, plumbing and programming, finish strip application, timers, and bar coding were not patented (and these are the only features not designed by RMS Equipment Co.). Similarly, there is no evidence that the second stage machine's tread stitcher, unloader movement, servo controls, fault detection, turret logic and cycles times were not patented.

Peirano admits that Michelin permits plant tours (and the Coleman family is only asking to observe two machines and not requesting to tour the plant) subject to confidentiality which is only intermittently enforced (many terms of which the Coleman family agreed to in their proposed protocol):

> MNA does not **generally** permit third persons to enter the plant unless there is a legitimate business reason. The few business guests permitted to enter the Woodburn, Indiana, plant must identify themselves to security personnel[4] and state the specific purpose for their visit.[5] … Each visitor must conspicuously wear a badge[6] denoting his or her status and the extent of their access within the plant is limited based on business need and prior approval with signed secrecy agreements[7] in **many** instances. …
>  Any items brought into the plant by a visitor **may** be inspected. The MNA employee with whom the visitor is meeting must accompany the visitor continuously[8] until the conference is

---

[4] The order incorporates this limitation. *MR 734.*
[5] The order incorporates this limitation. *MR 732-34.*
[6] The order incorporates this limitation. *MR 734.*
[7] The order incorporates this limitation. *MR 732-34.*
[8] The order incorporates this limitation. *MR 734.*

24

terminated and the visitor leaves the plant. …. Dealers or customers[9] of MNA who are permitted into the plant are **normally** asked to sign a confidentiality agreement. They are given "wide aisle" tours, and are accompanied by an MNA employee. … In addition, in the past we have given wide aisle tours to children on school trips, but **I am not aware of any**[10] in the last fifteen (15) years…. During the past 4 years, there have been two (2) occasions whereby MNA permitted persons (**e.g**.,[11] employee family members) who are not knowledgeable about tire manufacturing and who would not recognize or appreciate the specific confidential plant processes to enter the plant[12] on a limited basis during shut down periods.

*MR 489-90* (emphasis added)*.* The fact that Michelin only intermittently requires confidentiality agreements as a prerequisite to plant tours and only sporadically enforces the other confidentiality provisions shows that Michelin sometimes allows uncontrolled access to far broader information than what the Coleman family has requested.

Slagh's affidavit is no less conclusory than Peirano's.

For example, just one month after the failed tire was made at Michelin's plant, a local Fort Wayne television station ran a news story that showed tire

---

[9] As a result of having purchased the failed Michelin tire, Robert Coleman is a customer of Michelin.

[10] A witness's affidavit that he is unaware of a fact is not evidence disproving the fact. *See Rodriguez v. Naylor Indus., Inc.*, 763 S.W.2d 411, 413 (Tex. 1989).

[11] Employee family members may be one example of those who were permitted to tour the plant, but the overly general and conclusory statement does not purport to list all the categories of people permitted to tour the plant, and Michelin's admissions confirm that others who are unmentioned in Peirano's affidavit – such a governmental officials – have also toured the plant. *MR 700.*

[12] The affidavit offers no basis for Peirano's conclusory statement about what these plant tour attendees were knowledgeable about or what they would or would not recognize or appreciate.

manufacturing processes filmed from within the plant.  *See MR 155-56, 372-74.*  Slagh's affidavit states no tire building machines were shown on that news story but it does not dispute that Michelin's tire manufacturing processes were shown on the local news after being filmed from within the plant just a month after the failed tire was made there.  Instead, Slagh states that "Michelin's **general** practice [is] not to allow media in any of its plants."  *MR 586* (emphasis added).  This conclusory statement about Michelin's **general** practices is not evidence of any specific practice, and if disclosure of a trade secret is the occasional practice rather than the general practice, then the secret has still been disclosed.

While the local broadcast of footage filmed within the Fort Wayne tire plant revealed tire manufacturing processes, Michelin's tire building machines were revealed on the National Geographic show *Mega-factories: Michelin. MR 155-56, 375-77.*  Slagh's affidavit confirms that he merely "investigated" the filming of *Mega-factories: Michelin* (indicating his statements are based on information "made available" to him rather than personal knowledge[13]), *MR 584, 587,* and he does not dispute that the televised footage shows Michelin's tire building machines and processes.  *MR 587.* Instead, Slagh claims that the

---

[13] Information an affiant gathered from other sources through an investigation conducted in order to create the affidavit is not personal knowledge and has no probative value.  *See Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008).

footage shows Michelin tire building machines and processes in France and not the machines or processes at any of Michelin's North American plants. *See id.* Slagh makes no effort whatsoever to explain differences (if any) between Michelin's tire building machines in France – as depicted in the nationally televised *Mega-factories: Michelin* program – and the two tire building machines the Coleman family has asked to view. *See id.* Likewise, Slagh makes no effort to explain differences (if any) between Michelin's tire building process revealed in *Mega-factories: Michelin* and the processes the Coleman family has asked to view. *See id.* Slagh makes no effort to explain why a national broadcast of tire building practices and machines at one plant does not reveal trade secrets but one hour of confidentially observing two tire building machines at another plant would supposedly disclose trade secrets. *See id.*

Finally, Slagh states that the tire building machine depicted in the internet discussion of a self-identified Michelin employee working at the Fort Wayne plant where the tire was made is not a photograph taken at that plant. *MR 585.* The fact that the images of the RMS Equipment Co. tire machines used at Michelin's Fort Wayne plant were downloaded from the internet (not photos taken in the plant) was never disputed. *MR 154-55, 362-65.* Instead, the Coleman family offered this internet discussion to show that "Michelin's

27

employees at the tire plant where the failed tire was made discuss plant operations freely on the internet and post photographs to show what Michelin's tire building machines look like." *MR 154-55.* Regardless of whether Michelin employees photographed the RMS Equipment Co. tire machines used at the Fort Wayne plant to show what they look like or downloaded pictures of RMS Equipment Co. machines to show what they look like, the appearance of the machines at the Fort Wayne plant is nevertheless disclosed. Slagh neither disputes that Michelin's employees at the Fort Wayne tire plant discuss plant operations freely on the internet nor rebuts the fact they post pictures on the internet showing what Michelin's machines look like.

### c. Unanswered questions fatal to Michelin's alleged privilege

Michelin bore the burden to prove its alleged privilege, but Michelin only offered two affidavits that were not based solely on personal knowledge and failed to address critical questions necessary to meet the burden of proof:

- the two machines at issue were designed and made by RMS Equipment Co.; what would be disclosed by one hour of observing those machines that is secret from RMS Equipment Co. and its tire industry customers?

- the extensive televised footage of Michelin's tire building machines and processes shown on *Mega-factories: Michelin* was filmed at a different

28

plant, but how did that differ from what is the subject of the order?

- if Michelin was unconcerned about disclosing machines and processes on *Mega-factories: Michelin*, why is one hour of confidential observation of two RMS Equipment Co. machines a cause for concern?

- some of Michelin's machines and tire building processes are disclosed through Michelin's patents, and some are not, but are the machines and processes that are the subject of the order patented or not?

- Michelin allows tire dealers, government officials, family members, students, and customers to tour its plant (sometimes with a confidentiality agreement and sometimes without); what do these tours disclose?

- compared to one hour of observing two machines, what secrets might be disclosed that are not already disclosed to other RMS Equipment Co. customers, on tours of the plant, in patents, or in televised programs?

### 2. Michelin misapplies the standard for burdensomeness

Just as the party resisting discovery based on an alleged trade secret bears the initial burden of proof, the party resisting a discovery request for entry onto land also bears the burden of proof:

> In the context of a discovery request for entry onto land, the court must balance the degree to which the proposed inspection will aid in the search for truth against the burdens and dangers created by

the inspection. However, ***the burden is on the objecting party to satisfy the court that the testing "should not be had."***

*In re Kimberly-Clark Corp.*, 228 S.W.3d 480, 486 (Tex. App.—Dallas 2007, orig. proceeding) (emphasis added, citations omitted).  Just as Michelin's conclusory and rebutted affidavits failed to meet its initial burden to prove a trade secret, Michelin also failed to meet its initial burden to satisfy the trial court that the inspection "should not be had."  *See id.*

More significantly, Michelin applies the wrong standards when discussing the alleged burdensomeness.

Even if there is some burden associated with a discovery request, that is still not enough to justify protection because "it is only undue burden that warrants nonproduction." *ISK Biotech Corp. v. Lindsay*, 933 S.W.2d 565, 568 (Tex. App.-Houston [1st Dist.] 1996, no pet.). A discovery request will not result in an undue burden when the burdensomeness of responding to the request is the result of the responding party's own "conscious, discretionary decisions."  *Id.* at 569; *see also In re Whiteley*, 79 S.W.3d 729, 734–35 (Tex. App.-Corpus Christi 2002, orig. proceeding).  Michelin argues that providing one hour of access to the two tire building machines will cost $2,000 to "hang drapes" so that the Coleman family will not see any portion of the plant other the two machines and further argues that this process will cause Michelin to idle 12 tire building machines.  *MR 492.*  The order permits Michelin to hang

drapes and idle machines if it chooses to do so, *MR 734*, but the order certainly does not require such efforts. *MR 732-34.* Moreover, the Coleman family does not object if Michelin wants to hang drapes to hide the rest of the plant from observation; however, this would obviously be part of Michelin's "conscious, discretionary decisions" that raise the burden of the discovery response and so this is not an aspect of the discovery obligation which counts as part of the court's burdensome analysis. *See ISK Biotech Corp.*, 933 S.W.2d at 569; *In re Whiteley*, 79 S.W.3d at 734–35. Moreover, the protocol proposed by the Coleman family strictly prohibits any videography within the plant other than the specific machines and processes at issue and so "hanging drapes" would only prevent incidental, unrecorded observations. Neither of Michelin's affidavits suggests that the Coleman family would see anything behind the drapes that plant tourists have not seen on the multiple non-confidential plant tours that Michelin admits have repeatedly occurred.

### a. The "creation of evidence" objection was not raised below

Michelin's mandamus petition complains that the discovery request seeking observation of the tire building machines improperly requires Michelin to "create evidence." *Pet. Mand. pp. 14-16.* This argument is both legally and factually (and perhaps ethically) flawed.

Legally, this argument is fatally flawed because it was not raised in Michelin's objections. "The failure of the trial court to sustain an objection not made could not provide a basis for mandamus relief." *In re HEB Grocery Co., L.P.*, 375 S.W.3d 497, 501 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding); *see also id.* at 505 n. 11 (appellate courts do not reach issues on mandamus review which were not first raised in the trial court). The discovery request was served in December of 2014, *MR 57-66*, and Michelin filed its objections within the 30-day requirement to avoid waiving its objections. *SuppR 237-38; see* Tex. R. Civ. P. 196.2(a) ("The responding party must serve a written response on the requesting party within 30 days after service of the request…"); 193.2(e) ("An objection that is not made within the time required, or that is obscured by numerous unfounded objections, is waived unless the court excuses the waiver for good cause shown."); *Overstreet v. Home Indem. Co.*, 747 S.W.2d 822, 825 (Tex. App.—Dallas 1987, writ denied) (objections not raised within 30 days are waived absent an extension or a finding of good cause, citing *Peeples v. Honorable Fourth Supreme Judicial District*, 701 S.W.2d 635, 637 (Tex.1985); *Independent Insulating Glass/Southwest, Inc. v. Street*, 722 S.W.2d 798, 801–02 (Tex. App.—Ft. Worth 1987, writ dism'd w.o.j.)). Michelin's petition offers no record citation showing where it made a timely objection to the discovery request at issue in

this mandamus proceeding on grounds that the requested tire machine observation protocol requires the creation of evidence. In fact, as discussed below, Michelin's mandamus record omits the pages where its objections are set forth. *SuppR 237-38.* Michelin offers no record citation to where it made a timely objection to the "creation of evidence" because Michelin's objections and assertions of privilege did not include such an objection. *See SuppR 237-38.*

Factually, Michelin's argument is incorrect because the order only requires Michelin to make two identified tire building machines available for one hour of observation "while the machines are in normal use." *MR 734.* The order expressly provides that the observation of specific tire building processes is required only to be "as near as is practical" to the tire building processes requested to be observed. *MR 733.* Nothing in this order requires Michelin to "create evidence." Instead, the order merely allows one hour of observation of two identified tire building machines that already exist performing functions "as near as is practical" to the processes requested to be observed "while the machines are in normal use." *MR 732-34.*

Ethically, it is noteworthy that Michelin offers no record citation to show where it raised this "creation of evidence" objection in the trial court. Tex. R. App. P. 52.3(h) (a mandamus petition must contain "appropriate citations … to

the appendix or record" to support each argument). It is equally noteworthy that Michelin's mandamus record includes the first 48 pages of its 53-page discovery response, but excludes pages 52 and 53 where Michelin objected to the disputed request to observe the two tire building machines at issue. *Compare MR 414-61* (pages 1-48) with *SuppR 186-238* (the full document, including *SuppR 237-38* where Michelin's objection to the disputed discovery request). Michelin's choice to include an excerpt of its discovery response in in the mandamus record but to exclude the pages which show that Michelin did not raise an objection that it is now arguing conflicts with Rule 52:

> On motion of any party or on its own initiative, the court may — after notice and a reasonable opportunity to respond — impose just sanctions on a party or attorney who is not acting in good faith as indicated by … filing an appendix or record that is clearly misleading because of the omission of obviously important and material evidence or documents.

Tex. R. App. P. 52.11(d).

### b. Michelin misinterprets <u>In re Goodyear</u>

As mentioned above, Michelin's objections in the trial court did not include any objection that the tire machine observation protocol required the creation of evidence. *SuppR 237-38.* This raises the question why Michelin would raise an argument in its mandamus petition that does not correspond to its objections in the trial court. The apparent answer to this question lies in a recent Dallas Court of Appeals decision which reversed an order granting

entry upon land to for the purpose of creating demonstrative evidence. *See In re Goodyear Tire & Rubber Co.*, 437 S.W.3d 923 (Tex. App.—Dallas 2014, orig. proceeding).

One obvious difference between *In re Goodyear* and the case before this Court is Goodyear's objection (and supporting proof) complaining that the discovery request required the creation of demonstrative evidence, and Michelin's failure to properly raise such an objection. *SuppR 237-38.* In addition to this distinction, there are numerous additional differences between this mandamus proceeding and *In re Goodyear*:

- in the *In re Goodyear* case, the claimants did not object to Goodyear's affidavits, *id.* at 926, but the Coleman family made extensive and detailed objections to Michelin's affidavits; *MR 606-38;*

- Michelin's fatally flawed affidavits, objections to those affidavits, and the rebuttal proof that the machines were made by RMS Equipment Co. and the processes disclosed on local nightly news as well as *Mega-factories: Michelin* were not part of the *In re Goodyear* record;

- in the *In re Goodyear* case, "the plaintiffs did not attempt to offer contrary evidence," *id.* at 926 n. 1, and the Coleman family offered ample contrary evidence; *MR 29-117, 144-464;*

35

- the affidavits explaining the necessity of the discovery (from the Coleman family's expert and two engineers who worked for Michelin, *MR 104-10, 308-20)* were not part of the *In re Goodyear* record;

- in the *In re Goodyear* case, Goodyear conceded the alternative design "was both technologically and economically feasible" and easy and inexpensive to install, *id.* at 929 n. 2, but Michelin has not stipulated to the feasibility, ease, or cost of applying Filament at Zero; *cf. MR 733-34;*

- in the *In re Goodyear* case, Goodyear voluntarily "produced [a] tire manufacturing video" showing a tire being built on the same type of machine used to build the tire at issue, *id.* at 930, and the Coleman family asked Michelin to create a similar video but Michelin refused; *MR 37-39; SuppR 36-39, 44-45, 127, 177-78;*

- in the *In re Goodyear* case, "the video [was] intended for demonstrative purposes" because it did not involve "inspecting the machine that produced the tire at issue to determine whether the condition of the machine may have caused the production of a defective tire," but the order in this case does involve observing the machines that produced the tire at issue to determine the cause of the production of a defective tire, *MR 723-34,* and the Coleman family offered an affidavit proving that such an observation is "invaluable … substantive evidence;" *MR 104.*

Ultimately, all of the factors which undermine Michelin's arguments and support the trial court's decision were absent from *In re Goodyear.*

Michelin cites the *In re Goodyear* case as if it stands for the proposition that a party cannot observe evidence in another party's possession, but that is certainly not the holding. Instead, the court ruled that the burdensomeness of allowing the creation of a demonstrative exhibit of a tire machine that was not used to make the tire at issue (a burden which Goodyear proved based on evidence that Michelin has not offered) outweighed the claimant's need for a demonstrative exhibit (where Goodyear had already produced a similar video and stipulated to the alternative design, and the claimant did not offer expert affidavits to prove the need for the discovery).

In this case, Michelin raised no such objection regarding the "creation of evidence," Michelin's affidavits were fatally flawed and applied an incorrect burdensomeness analysis, the machines to be observed are the exact ones used to build the failed tire and so evidence sought is substantive and not demonstrative, and the Coleman family offered abundant evidence proving the need for the discovery.

C.      *Coleman Proved the Reasonable Necessity for this Discovery*

If Michelin had proved its alleged privilege in connection with the limited one-hour visual observation of the two tire building processes (which it did

not), then the burden would have switched to the Coleman family to "show reasonable necessity for the requested materials." *In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 591 (Tex. 2009) (orig. proceeding) (quoting *In re Bass*, 113 S.W.3d 735, 738 (Tex. 2003) (orig. proceeding)). The Texas Supreme Court has not defined "what would or would not be considered necessary for a fair adjudication, indicating instead that the application of the test would depend on the circumstances presented." *Id.* at 592 (quoting *In re Bridgestone/ Firestone, Inc.*, 106 S.W.3d 730, 732 (Tex. 2003)).

Contrary to Michelin's arguments, however, the Texas Supreme Court has expressly rejected the idea that the burden to show reasonable necessity for discovery means showing "the requesting party cannot prevail without" that discovery. *In re Bridgestone/ Firestone, Inc.*, 106 S.W.3d at 732. Instead, a party can show reasonable necessity for discovery in a situation where it was "possible for a party to prevail without access to trade secret information and yet be unfair to put him to much weaker proof without the information." *Id.*

While the Texas Supreme Court has not defined "what would or would not be considered necessary for a fair adjudication," *In re Union Pac.*, 294 S.W.3d at 592*, this issue has been addressed by the Austin Court of Appeals. *See John Paul Mitchell Sys. v. Randalls Food Markets, Inc.*, 17 S.W.3d 721, 739 (Tex. App.-Austin 2000, pet. denied). The *John Paul Mitchell* case

38

confirms that a "requesting party must describe with particularity how the protected information is required to reach conclusions in the case." *John Paul Mitchell Sys., Inc.*, 17 S.W.3d at 739. Once the requesting party describes the need for the discovery, the "trial court's role [is] to weigh the degree of the requesting party's need for the information against the potential harm of disclosure to the resisting party." *Id.* at 738.

Although Michelin did not meet its own burden, the Coleman family preemptively proved the reasonable necessity for this discovery with evidence from four different tire experts (two who most commonly consult with claimants and two who commonly consult with defendants; two with backgrounds at Michelin and two with backgrounds at other tire companies).

### 1. 1st expert: invaluable causation proof otherwise unavailable

Dennis Carlson is a tire engineer and expert whose background is with Michelin. *MR 104.* Because this case involves claims that grossly negligent conduct at the tire plant resulted in a defective tire, *MR 17-21, 25-26*, the Coleman family offered Carlson's affidavit proving the reasonable necessity to observe the tire building machines under such circumstances:

> When simultaneously addressing claims involving both negligent practices at the tire plant as well as manufacturing and design defects, such observations of the tire machines while in use – even one hour of observation limited to cause no interruption to the manufacturing process as set forth in the attached order – is invaluable to documenting how the criticized manufacturing

39

processes contributed to (or failed to contribute to) the manufacturing anomalies identified in the tire. This substantive evidence was critical to establishing (1) the causal link between the criticized practices at the plant and the flaws in the tire, (2) the relative simplicity of incorporating safer tire designs calculated to increase the tire's robustness so that it would have been less susceptible to premature failure as a result of manufacturing defects, (3) better practices to more carefully build and inspect tires so that fewer tires with anomalies reach the consuming public, etc. This type of evidence is especially critical [because] … obtaining discovery from the tire companies is commonly the only means of establishing the link between a criticized practice at the tire plant and the safety concerns which subsequently manifest in a tire tread separation failure that kills or injures a claimant.

*MR 104-05.* Carlson's affidavit is based on personal knowledge because he participated in a one-hour observation of tire building machines where the order is almost identical to the order challenged in this mandamus action.

*Compare MR 105, 107-10 with 732-34.* Carlson confirmed that one hour's observation of the tire machines provides invaluable substantive evidence critical to proving causation, the ease of implementing safer designs to counteract sloppiness in the manufacturing process, and standards of care.

*MR 105.* Finally, Carlson explained that obtaining this evidence from the tire company is "commonly the only means of establishing the link between a criticized practice at the tire plant and the safety concerns which subsequently manifest in a tire tread separation failure." *MR 105.*

### 2. 2nd expert: discovery needed for jury to understand case

Joe Grant is another tire expert, *MR 111*, and the Coleman family offered his deposition testimony explaining why he creates videotapes of the tire building process as a trial exhibit:

> Oh, most jurors, I'm sure, have no idea how tires are actually manufactured, or the complex nature of the various components, and the steps that have to go through – that have to be gone through in order to manufacture a tire. So I think [videotape of the tire building process at the plant] would be very beneficial from that standpoint, from a juror's perspective…. [I]t's a pretty complex process that, telling it I don't think does anywhere near the amount of – of helpfulness to the jury as actually showing them the actual manufacturing. I think they'd find it actually very interesting.

*MR 112.* Grant confirmed that showing the tire building process is much more helpful to the jury than simply giving testimony about the process because it is complicated and difficult for some jurors to understand. *MR 112.* Michelin's petition does not raise any complaint about Grant's testimony.

### 3. 3rd expert: critical proof of designs to fix manufacturing flaws

Troy Cottles is a tire expert who previously designed tires for Goodyear-Dunlop. *MR 310-12.* Cottles' affidavit is proof that access to the manufacturing processes is "ultimately important" when addressing claims like those in this case which involve both negligent practices at the plant and also defects in a tire made at the plant:

> When a full forensic tire failure analysis is conducted in cases

where there are claims of design and manufacturing defects, in addition to claims of negligent lire building, processing, or inspection, it is ultimately important to have access to the manufacturing facility in order to fairly establish the likelihood of contribution to the failure from the specific plant aspects.

*MR 312.* Cottles explained that this is an accepted practice in the tire industry as reflected by the root cause analysis of the highly publicized Firestone tread separation investigation. *MR 312.*

Cottles also participated in the same one-hour observation of tire building machines referenced in Carlson's affidavit, *MR 105, 312*, and Cottles explained that restricting the observation to one hour while the machines are in use is limited "so as not to cause an interruption of the manufacturing process." *MR 312.* Cottles' affidavit is further evidence of the "importance" of this "critical" evidence both to prove causation and also to prove how proposed alternative designs can be used to compensate for weaknesses in the manufacturing process at the plant:

> The importance of evidence derived from such an inspection is to establish its link to the observed defects or inadequacies of the failed subject tire and to identify capabilities of the manufacturer to produce a more robustly designed tire. These observations of the tire building machines in operation building a tire as near as practical to the tire at issue as contrasted to building a tire with known safer tire designs provides critical evidence to prove how careless conditions at the plant can result in manufacturing defects and to prove the ease with which the tire company can implement more robust tire designs to overcome shortcomings resulting from those tire building processes.

42

*MR 312.* Finally, Cottles' affidavit is proof that the discovery requested is not available from any other source. *MR 312.*

### 4. 4th expert: discovery reasonably necessary for failure analysis

John Daws is another tire engineer and expert whose background is with Michelin. *MR 314-16.* Daws explained that much information about a tire's design and manufacture can be identified from inspecting the tire, *MR 318, 621-38*, but additional information is required for a root cause analysis. *MR 318.* In this case, Michelin and the Coleman family differ in their analysis of why the tire failed. Daws' affidavit is proof that a "tire analyst would have a reasonable necessity for … access to tire plant information, including the tire component fabrication machines, the tire building machines," in order to resolve the root cause analysis. *MR 318.* As an example of this reasonable necessity, Daws explained access to such evidence was part of the root cause analysis in the Firestone tread separation investigation:

> [T]he most widely known recent failure analysis is probably the one performed on the Firestone Radial ATX and Wilderness AT tires that were the subject of a massive recall in 2000. … Firestone retained the services of an outside consultant, Dr. Sanjay Govindjee, of the University of California at Berkeley, to attempt to provide an understanding about the failure mode seen in the subject tires. As part of his work, Dr. Govindjee's report indicated that he had access to … the Decatur, Illinois, tire plant as part of his analysis. NHTSA also retained the service of an outside consultant, Dr. William J. Van Ooij, of the University of Cincinnati, to assist in their failure analysis. Dr. Van Ooij's report indicated that his analysis was based on, among other things, …

43

a tour of the Decatur, Illinois plant, tours of three other non-Firestone tire manufacturing facilities ... The depth and breadth of the information provided to these outside consultants in this matter was consistent with that reasonably necessary for them to perform the required failure analyses with scientific integrity.

*MR 319-20.* Michelin's petition does not raise any complaint about Daws' affidavit.

### 5. Michelin's objections to the affidavits are unfounded

Michelin raises several groundless objections to the affidavits.

First, Michelin complains that Carlson's affidavit is hearsay.[14] Obviously, any affidavit offered in the discovery context is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and is – therefore – hearsay. Tex. R. Evid. 801(d). By their very nature, all affidavits are hearsay, including Michelin's affidavits in this case, and this fact was discussed at the hearing. *MR 746.* However, hearsay is admissible as provided by the Texas Rules of Civil Procedure. Tex. R. Evid. 802. In the context of discovery hearings, Rule 193 expressly provides for the use of "affidavits served at least seven days before the hearing." Tex. R. Civ. P. 193.4(a). Because there is no dispute that the affidavits were all served well over seven days before the hearing, the obvious fact that an affidavit is an out-of-court statement is

---

[14] Michelin makes no similar objection to Cottles' or Daws' affidavits.

44

immaterial because affidavits are provided for at discovery hearings by Rule 193. *Compare* Tex. R. Evid. 802 *with* Tex. R. Civ. P. 193.4(a). Michelin's objection is meritless.

Next, Michelin complains that neither Carlson's affidavit nor Cottles' affidavit has the style of this case as a heading.[15] The requirements for an affidavit valid under Texas law are set forth in the Government Code. *Mansions in the Forest, L.P. v. Montgomery County*, 365 S.W.3d 314, 316 (Tex. 2012). There is no requirement that an affidavit must have a heading:

> "'Affidavit' means a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office."

Tex. Gov't Code Ann. § 312.011(1). Both Carlson's and Cottles' affidavits are written, factual, signed, sworn before a notary, and certified. *MR 104-110, 310-13.* Moreover, both Carlson's affidavit and Cottles' affidavit contain their personal knowledge and explanation of the critical and invaluable nature of the proof obtained from a similar one hour observation of tire building machines. *MR 104-110, 310-13.* These affidavits meet the requirements of the Government Code, and Michelin's objection about the lack of a heading is meritless.

---

[15] Michelin makes no similar objection to Daws' affidavit.

Third, Michelin complains that Carlson's affidavit was not submitted for this case (it is unclear if Michelin intended this objection to apply to Cottles' affidavit as well).[16] Both affidavits were submitted in this case, and Cottles' affidavit was prepared for this case, *MR 744*, while Carlson's affidavit was prepared for a similar case as proof of the need to observe the tire machines when addressing in-plant negligence as it relates to the cause of defects in a tire (which is the exact same issue in this case). *Compare MR 17-21, 25-26 with MR 105.* Regardless of the fact that Cottles' affidavit was prepared for this case and Carlson's affidavit was prepared for another case, both affidavits are sworn proof of the need to observe the tire machines to prove causation linking the in-plant negligence to the tire defects. Michelin's objection is meritless.

Michelin further objects that neither Carlson's nor Cottles' affidavit states that he cannot render an opinion without observing the machines. The Texas Supreme Court has specifically rejected this objection when it held this is not the correct standard for defining a reasonable necessity for discovery:

> In the present case, Firestone argues that the test should be applied to preclude discovery of trade secret information unless the requesting party cannot prevail without it. While it would certainly be unfair to allow a party to prevail solely by withholding such information, our decision in *Continental General Tire* cannot be read so narrowly.

---

[16] Michelin makes no similar objection to Daws' affidavit.

*In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732 (Tex. 2003). Michelin's objection is without merit.

Finally, Michelin complains that Carlson's affidavit violated his settlement agreement with Michelin.[17] This is incorrect. Carlson's agreement precludes him from working as an expert in a case against Michelin. *MR 131.* Carlson was not retained in this case, he has made no appearance in this case, he did not prepare his affidavit in this case, he did no work in this case, and Michelin was made fully aware of these facts. *MR 145-48, 170-76.* Michelin further complains that Carlson did not "withdraw" his affidavit, but the affidavit was not filed by Carlson (it was filed by the Coleman family), and so Carlson had no more ability to withdraw his affidavit than Daws or Grant or National Geographic had authority to withdraw their affidavit, testimony, or television program. *MR 173.* Ultimately, Carlson left the issue up to the court:

> I do not agree with Michelin's position, and I'm not sure that it is proper (or even legal) to coerce someone to withdraw truthful testimony that in no way violates a protective order, nondisclosure agreement, or the Settlement Agreement that I entered into with MNA over 15 years ago. Notwithstanding the fact that my affidavit does not violate any agreement that I'm aware of, as well as the fact that I'm uncertain as to whether it can be withdrawn at this point, Michelin is threatening to sue me if I don't ask you to withdraw it. Therefore, if you think that it's proper to withdraw my affidavit in response to the threat of a lawsuit, please ask the court

---

[17] Daws also formerly worked for Michlein, but Michelin makes no similar objection to Daws' affidavit.

47

permission to withdraw it, and then withdraw it should the court decide that is the appropriate action under these circumstances.

*MR 176.* Michelin's argument that Carlson's affidavit violates any settlement agreement is incorrect and the related objection that the affidavit is not evidence is equally flawed. Moreover, Carlson's affidavit provides no information which is not already contained in Cottles' and Daws' affidavits and Grant's testimony, *compare MR 104-110 with MR 310-20,* so Michelin's objection is both meritless and without effect.

D. *Conflicting Evidence Provides Discretion for the Narrow Order*

As discussed above, Texas law is very clear in holding that trial court's resolution of conflicting evidence is not to be second guessed on mandamus:

> In determining whether the trial court abused its discretion with respect to resolution of factual matters, we may not substitute our judgment for that of the trial court and may not disturb the trial court's decision unless it is shown to be arbitrary and unreasonable.

*In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004) (orig. proceeding); *see also In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 149 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding); *Walter v. Marathon Oil Corp.*, 422 S.W.3d 848, 856 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *In re Guidry*, 316 S.W.3d 729, 737 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding).

> The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision.

*Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (orig.

proceeding); *see also In re Le*, 335 S.W.3d 808, 813 (Tex. App.—Houston

[14th Dist.] 2011, orig. proceeding).

> A trial court's determination of a factual issue is entitled to
> deference in a mandamus proceeding and should not be set aside
> unless it is clear from the record that only one decision could have
> been reached.

*In re Kuntz*, 124 S.W.3d 179, 180 (Tex. 2003) (orig. proceeding); *see also In*

*re Union Carbide Corp.*, 145 S.W.3d 805, 807 (Tex. App.—Houston [14th

Dist.] 2004, orig. proceeding).

> If the record contains legally sufficient evidence both against and
> in support of the trial court's decision then mandamus will not lie
> because weighing conflicting evidence is a trial court function.

*In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 686 (Tex. 2007) (orig. proceeding).

> It is well established Texas law that an appellate court may not
> deal with disputed areas of fact in an original mandamus
> proceeding.

*In re Angelini*, 186 S.W.3d 558, 560 (Tex. 2006) (orig. proceeding).

In this case, there were numerous conflicts for the trial court to resolve.

For example, Michelin provided broad claims that its processes are not

generally disclosed to the public, and the Coleman brought conflicting

evidence establishing particular disclosures. *MR 154-56, 362-65, 372-77,*

*490, 652-53, 657-661, 676-77, 680-92, 696-700, 722, 723; see also MR 489-*

*90 (only some unidentified technologies are not patented to avoid disclosure,*

*only some third parties who are granted access to the plant are asked to sign confidentiality agreements, etc.).* Michelin provided the claim that its tire building machines cannot be identified by reverse engineering (although the machines at issue have already been identified), and the Coleman family brought conflicting evidence that the tire's construction is not a secret because it can be reverse engineered. *MR 318-19, 621-38, 702-03.*

Similarly, Michelin cited a case from Alabama where an all-day inspection of the whole tire plant was denied, and the Coleman family provided the court with a subsequent order where the Alabama Supreme Court approved a one-hour observation of tire building machines. *MR 63-66; see Ex parte Continental Tire the Americas, LLC*, No. 1130556 (Ala. Apr. 9, 2014). Michelin cited a case from Kansas where a day-long inspection of the whole tire plant was denied, and the Coleman family provided the court with a subsequent order where the Kansas Supreme Court approved a one-hour observation of tire building machines. *MR 60-62; see Cooper Tire & Rubber Co. v. Lahey*, No. 13-09979-S (Kan. Dec. 23, 2013). At the hearing, Michelin discussed other orders where inspections were denied, and the Coleman family discussed additional orders where more tailored inspections were granted. *MR 760; see In Re Bridgestone/Firestone,* No. 01-01-410 (Tex. Coordinated Litigation, Sep. 20, 2001)*; Rivera v. Yokohama Tire Corp.,* No. C-

1745-00-B (93rd Dist. Ct. Hidalgo County, Tex., Mar. 19, 2002), *mand. denied sub nom In re Yokohoma Tire Corp.*, No. 13-02-205-CV (Tex. App. – Corpus Christi Jul. 22, 2004); *see also Blundon v. Goodyear Dunlop Tires N. Am. Ltd.*, 11CV990S, 2012 WL 5473069 (W.D.N.Y. Nov. 9, 2012); *Griffith v. Goodyear Dunlop Tires N. Am. Ltd.*, 11CV761S, 2012 WL 5473494 (W.D.N.Y. Nov. 9, 2012); *Shakur v. Bridgestone/Firestone, Inc.*, CIV-05-983-C, 2006 WL 1451490 (W.D. Okla. May 24, 2006).

With respect to the orders concerning access to tire plants or tire building machines, the orders are generally granted or denied based on the evidence offered in each case and based on the scope of the order. The evidence is this case far exceeds the evidence discussed in any of the other cases mentioned by either party, and the observation order is as narrow (and in most cases, much narrower) than all of the other orders and grants Michelin greater confidentiality than any of the other orders. The order in this case is uniquely limited in scope:

- Michelin was granted the maximum amount of confidentiality as permitted under Texas law; *MR 732-34*;

- The Coleman family is expressly forbidden from conducting any sampling, measurements, or testing of any kind; *MR 733*;

- The Coleman family is expressly limited to visual observation of the two

51

machines only; *MR 733*;

- The Coleman family is expressly forbidden from bringing any recording device besides one videographer's equipment; *MR 733-34*;

- The videotaping is confidential to the greatest extent allowed under Texas law and is expressly limited to the two machines; *MR 733-34*;

- The Coleman family is expressly forbidden from interrupting or interfering with the normal operation of the machines; *MR 734*;

- The Coleman family is expressly forbidden from interfering with the normal activities of, or communicating with, plant workers; *MR 734*;

- The Coleman family is expressly required to follow all of Michelin's requests regarding identification, badges, escorts, hardhats, ear and eye protection, and footwear; *MR 734*;

- The Coleman family is expressly limited to 15 minutes of observation of the first stage machine used to build the failed tire; *MR 733*;

- The Coleman family is expressly limited to 45 minutes of observation of the second stage machine used to build the failed tire; *MR 733-34*;

- The persons permitted to attend are expressly limited and must be identified and must consent to complete confidentiality; *MR 732-34*; and

- There are provisions requiring the observation to accommodate the normal operation of the plant without interruption. *MR 733-34*.

No other order that either party has cited is as narrowly tailored. No other case that either party cited discuses affidavits resisting the discovery which were based on information made available to the affiant or were as thoroughly rebutted. No other case cited by either party involved evidence from four different tire experts explaining the need for the limited discovery requested.

## VII. CONCLUSION AND PRAYER

This a simple discovery dispute involving just one hour of observation of two specifically identified tire building machines used to make a defective tire that resulted in a fatal crash. The Coleman family has been requesting this information for ten months, and both parties agree that this issue can be resolved on an expedited basis. The Coleman family urges that Michelin's petition can be denied on an expedited basis because the record shows that Michelin did not meet its burden and yet the Coleman family established the reasonable necessity for the requested one-hour observation of the tire building machines. Even if the evidence were less clear than the Coleman family has shown, then the trial court's decision would still have been based on conflicting evidence and this circumstance removes the issue from the proper scope of mandamus review. The Coleman family prays that this Court swiftly deny mandamus review.

Respectfully submitted,

THE EDWARDS LAW FIRM

BY: /s/ John Blaise Gsanger
John Blaise Gsanger
State Bar No. 00786662
Scott Marshall
State Bar No. 24077207
802 N. Carancahua St., Suite 1400
Corpus Christi, Texas 78401
Telephone: (361) 698-7600
Facsimile:  (361) 698-7614

Tim Riley
State Bar No. 16931300
Riley Law Firm
The Civil Justice Center
112 East 4th Street
Houston, Texas 77007
Telephone: (713) 646-1000
Facsimile: (800) 637-1955

Michael Bourland
State Bar No. 24009912
Witt, McGregor & Bourland, PLLC
8004 Woodway Drive, Suite 400
Waco, Texas 76712
Telephone: (254) 751-9133

**ATTORNEYS FOR REAL PARTIES IN INTEREST**

## X.  CERTIFICATES

I certify that I have reviewed the Response to Petition for Writ of Mandamus and the factual statements herein are supported by evidence included in the record and supplemental record.

BY:  /s/ John Blaise Gsanger

John Blaise Gsanger
State Bar No. 00786662

## CERTIFICATE OF COMPLIANCE

I certify that the sections of the Response to Petition for Writ of Mandamus subject to the word limit contain 11,872 words according to the word count of the computer program used to prepare this document.

BY: /s/ John Blaise Gsanger
John Blaise Gsanger
State Bar No. 00786662

## CERTIFICATE OF SERVICE

I certify that copies of the foregoing Response to Petition for Writ of Mandamus was served upon the Respondent and all attorneys of record for all parties to the above cause on this the 22nd day of July, 2015.

BY: /s/ John Blaise Gsanger
John Blaise Gsanger
State Bar No. 00786662

**Via Facsimile: (512) 472-0721**
Thomas M. Bullion III
Chris A. Blackerby
GERMER BEAMAN & BROWN, LLP
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Email: tbullion@germer-austin.com; cblackerby@germer-austin.com

**Via facsimile: (864) 232-2925**
Giles M. Schanen, Jr.
NELSON MULLINS RILEY & SCARBOROUGH, LLP
104 South Main Street, 9th Floor
Greenville, SC 29601
Email: giles.schanen@nelsonmullins.com

**Via Facsimile: (512) 482-5028**
Debora B. Alsup
THOMPSON & KNIGHT LLP
98 San Jacinto Blvd., Suite 1900
Austin, TX 78701-4238
Email: debora.alsup@tklaw.com

**Via Facsimile: (713) 523-4159**
Robert E. Ammons
Bennett A. Midlo
THE AMMONS LAW FIRM, LLP
3700 Montrose Boulevard
Houston, Texas 77006
Email: rob@ammonslaw.com; bennett@ammonslaw.com